# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

HAMO MURAD IBRAHIM,

          **Plaintiff,**

    **vs.**

NANCY A. BERRYHILL, Acting
Commissioner of the Social Security
Administration;

          **Defendant.**

4:18CV3110

MEMORANDUM
AND ORDER

This matter is before the Court on the Motion for an Order Reversing Commissioner's Decision, ECF No. 22, filed by Plaintiff Hamo Murad Ibrahim, and the Motion to Affirm Commissioner's Decision, ECF No. 27, filed by Defendant Nancy A. Berryhill ("Commissioner"). For the reasons stated below, the Motion for an Order Reversing Commissioner's Decision will be denied and the Motion to Affirm Commissioner's Decision will be granted.

## PROCEDURAL HISTORY

Ibrahim filed for supplemental security income on October 22, 2015. Tr. 11.[1] His claim was denied initially on February 12, 2016, and again on reconsideration on April 4, 2016. *Id.* He requested a hearing, which was held on November 8, 2017. *Id.* At the hearing, Ibrahim amended the alleged onset date of disability to October 22, 2015, the application date. *Id.* The Administrative Law Judge (ALJ) issued a written opinion denying benefits on January 25, 2018. Tr. 8-22.

---

[1] Pinpoint citations to the transcript of the Administrative Record ("Tr.") shall be to the consecutively numbered pages in the record rather than to the Page ID of the docket.

An ALJ follows a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 416.920(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See id.* Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. See 20 C.F.R. § 416.920(a)(4)(i), (b). The ALJ found that Ibrahim had not engaged in substantial gainful activity since the application date. Tr. 13.

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 416.920(a)(4)(ii) & (c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities," 20 C.F.R. § 416.920(a)(4)(ii) & (c), and satisfies the "duration requirement." 20 C.F.R. § 416.909 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "[c]apacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.922(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). The ALJ found that Ibrahim had the following severe impairments: hypothyroidism; major depressive disorder; post-traumatic stress disorder (PTSD); and generalized anxiety disorder (GAD). Tr. 13.

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 416.920(a). The ALJ found that Ibrahim did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 14.

Step four requires the ALJ to consider the claimant's residual functional capacity[2] ("RFC") to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. § 416.920(a)(4)(iv), (e), (f). If the claimant can perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 416.920(a)(4)(iv), (f). The ALJ found that Ibrahim had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: Ibrahim was limited to occasional exposure to extreme cold, extreme heat, humidity, hazardous machinery, and unprotected heights. Tr. 14. The ALJ also found that Ibrahim could understand, remember, and carry out simple routine instructions, Tr. 14, and he had no past relevant work. Tr. 21.

At step five, the ALJ must determine whether the claimant is able to do any other work considering the claimant's RFC, age, education, and work experience. 20 C.F.R.

---

[2] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

§ 416.920(a)(4)(v). If the claimant can do other work, the claimant is not disabled. *Id.* The ALJ determined that there are jobs that exist in significant numbers in the national economy that Ibrahim could perform, and, therefore, Ibrahim was not disabled from the application date, October 22, 2015, through the date of the decision, January 25, 2018. Tr. 21-22.

On July 2, 2018, the Appeals Council denied review, and the ALJ's decision stands as the Commissioner's final decision. Tr. 1. On August 8, 2018, Ibrahim filed a Complaint with this Court for judicial review of the agency decision. Compl., ECF No. 1.

## FACTUAL BACKGROUND[3]

Ibrahim was born in 1966.[4] Tr. 118. He had 5 years of formal education and can read or write little in English.[5] Tr. 119. He suffers from multiple physical issues, but his most severe problems involve his mental health. Tr. 218.

On October 8, 2015, Ibrahim's primary care provider, John Grandgenett, APRN, concluded Ibrahim had situational depression/anxiety and prescribed Effexor. Tr. 299. On October 22, 2015, Ibrahim filed an application for social security benefits.

---

[3] This Court's General Order No. 2015-05 instructs that a plaintiff challenging a final decision of the Commissioner of the Social Security Administration (SSA) shall include in his or her brief supporting a motion to reverse the decision "a statement of material facts," which is "supported by page references to the administrative record." The Commissioner must then file a motion to affirm its decision and include with its supporting brief "a non-repetitive counter-statement," if the Commissioner disagrees with any portion of the plaintiff's statement. Here, the parties have substantially complied, and a synthesis of their competing statements composes this section of the Court's order.

[4] Ibrahim's counsel alleges Ibrahim is likely much older and states Ibrahim "testified that his family registered his birth much later accounting for the inaccuracy in his birth record." Pl. Br., ECF No. 24, Page ID 633. Such testimony does not appear in the administrative hearing transcript and instead is simply an assertion made by Ibrahim's legal counsel in a correspondence to the Appeals Council. Tr. 218.

[5] Ibrahim's counsel alleges Ibrahim is also unable to read or write in his own language of Kurdish. Pl. Br., ECF No. 24, Page ID 633. However, this assertion is supported only by a statement made by Ibrahim's legal counsel in correspondence to the Appeals Council. Tr. 218.

On December 04, 2015, Grandgenett noted Ibrahim had headaches, dizziness, presyncope, chest pains and palpations. Tr. 297. Grandgenett diagnosed anxiety and prescribed Lorazepam. Tr. 450.

On January 11, 2016, consultative examiner Dr. Barbara Eckert conducted Ibrahim's consultative mental health exam ordered by Social Security. Tr. 320-23. Dr. Eckert noted Ibrahim's symptoms of anxiety include worrying, restlessness, and irritability. Tr. 321. Ibrahim described to Dr. Eckert his depression over the two prior weeks as an 8 or 9 out of a ten-point scale and indicated his depression day to day was unpredictable. Tr. 321. Dr. Eckert noted that Ibrahim reported sleeping up to 12 hours or not at all and waking up frequently. Tr. 321. Ibrahim reported having "scary" dreams or nightmares three times a week and re-experiencing trauma and flashbacks. Tr. 321. Ibrahim felt hopeless and worthless. Tr. 321 He was irritable around his family and worried frequently. Tr. 321. Ibrahim described his current mood as "okay," yet Dr. Eckert noted: "[H]is mood is not congruent with his self-report. He appears to be in a depressed mood. He makes no eye contact during the evaluation." Tr. 321.

Dr. Eckert noted Ibrahim had no disturbance in perception and denied having auditory hallucinations. Tr. 322. Although Ibrahim stated he might have some visual hallucinations, Dr. Eckert concluded he did not appear to respond to internal stimuli. Tr. 322. She addressed his functioning by saying he was able to dress himself and maintain his own hygiene. Tr. 323.

Ibrahim had memory problems and would forget where items were, such as his glasses when they were in his hand. Tr. 321. Dr. Eckert noted that he might need requests

repeated and had trouble with comprehension and memory. Tr. 321. Dr. Eckert found Ibrahim appeared to have moderate difficulty with sustained concentration for the interview. Tr. 323. Dr. Eckert found Ibrahim might need extra time to complete tasks and would be unable to keep up in a fast-paced environment. Tr. 323. Dr. Eckert further found Ibrahim might need additional supervision and time to carry out short and simple instructions under ordinary supervision and, his participation in the interview was indicative of that. Tr. 323.

Dr. Eckert stated Ibrahim was "oriented times three," was able to state the date, and could receive, organize, analyze, remember, and express information appropriately in a conversation. Tr. 322. Dr. Eckert stated Ibrahim was cooperative. Tr. 322. Ibrahim's psychomotor activity was slow, but his thought content was appropriate and adequate; and he had no hallucinations, delusions, or suicidal/homicidal ideations. Tr. 322. Although Ibrahim had difficulty with serial sevens, recalling words, and most tasks, Dr. Eckert estimated Ibrahim had average intelligence. Tr. 322. Dr. Eckert stated Ibrahim's overall cognitive functioning appeared to be in the normal range. Tr. 322.

On February 10, 2016, at the request of the Social Security Administration, consultative examiner Elizabeth Dayton, D.O., performed a physical examination. Tr. 326-31. Dr. Dayton noted Ibrahim was pleasant and had normal speech and thought content. Tr. 330.

Ibrahim reported to Dr. Dayton that he was diagnosed with a thyroid disorder in 1992. Tr. 326. He reported that his thyroid condition initially caused him difficulty sleeping, hot flashes, trembling or shaking of his body, and changes in the color of his face and around his eyes. Tr. 326. Ibrahim informed Dr. Dayton that the medications he was taking

for his thyroid disorder helped some of his symptoms, but they had not entirely gone away. Tr. 326. Dayton found Ibrahim appeared to be on the correct medicine for his thyroid disease but needed to ensure his medication dosage controlled his symptoms. Tr. 330.

On March 15, 2016, Ibrahim told Grandgenett that he could not sleep and did not like to be outside if it was sunny. Tr. 446. Grandgenett prescribed Lexapro. Tr. 446.

On May 21, 2016, Ibrahim's treating therapist, Seth Brown, LIMHP, concluded he had PTSD (diagnosis F43.10). Tr. 364. On the mental status examination, Ibrahim had normal attention, concentration, and memory. Tr. 360. His eye contact was normal, facial expression was responsive, and affect was appropriate. Tr. 361. His speech flow was normal, thought content was appropriate, and organization was logical; he had no preoccupations or hallucinations. Tr. 361. His intelligence was average, and his abstraction, judgment, reality-testing, and insight were all normal. Tr. 361.

On July 1, 2016, Ibrahim reported being anxious and depressed. Tr. 344. He also reported poor sleep. Tr. 344. Nevertheless, he stated he desired not to take medication for depression or sleep. Tr. 344. Brown instructed Ibrahim to perform relaxation techniques. Tr. 344-47.

On August 12, 2016, Brown indicated Ibrahim was minimally receptive to relaxation techniques and minimally open to working with a doctor for medication. Tr. 334.

On October 28, 2016, Ibrahim reported to Grandgenett that he experienced depression, anxiety, and insomnia. Tr. 438. Grandgenett refilled Ibrahim's Lexapro prescription. Tr. 438.

On January 13, 2017, Brown noted Ibrahim had been somewhat resistant to improving himself physically and appeared to come up with excuses. Tr. 421. Ibrahim agreed to work on relaxation techniques to deal with anxiety. Tr. 421.

On February 20, 2017, Ibrahim returned to Grandgenett and reported Lexapro helped with his moodiness and anger. Tr. 434. Ibrahim did not report any continued insomnia. Tr. 434.

On March 3, 2017, Ibrahim told Brown that he was feeling better with medication, although he reported he felt very tired. Tr. 411.

On March 24, 2017, Ibrahim reported to Brown that he felt better emotionally, but was having difficulty with energy and motivation. Tr. 406. Brown encouraged him to socialize, go to bed earlier, eat healthy, and get exercise. Tr. 406.

On April 10, 2017, Ibrahim told Grandgenett that Lexapro helped his depression and anxiety. Tr. 432.

In a narrative letter dated May 5, 2017, Brown wrote to Ibrahim's physician stating that Ibrahim had been taking Escitalopram, the generic name for Lexapro, for about a month. Tr. 510. Brown stated that Ibrahim decreased his Lexapro dosage and ten days later experienced lower mood. Tr. 510. Brown stated that: "[Ibrahim] stated that he has always had a cyclic form to his mood. He will feel fine for a week or so, feel down another week or so and then be unable to get out of bed. Over a month's time he will experience this pattern and have it repeat every month." Tr. 510. Brown questioned if the cyclical pattern was akin to Bipolar Disorder. Tr. 510.

Ibrahim apparently stopped taking Lexapro, because on May 12, 2017, he reported having nightmares, but noted that Lexapro had helped when he was on it. Tr. 430, 434. Grandgenett restarted Ibrahim on Lexapro. Tr. 430.

On May 26, 2017, Brown referred Ibrahim to a psychiatrist and encouraged him to obtain medication through the psychiatrist rather than his general practitioner. Tr. 501.

On June 30, 2017, Brown noted that Ibrahim was suffering from command hallucinations. Tr. 482. Ibrahim believed he saw and heard people who were dead, and said he had experienced this throughout much of his life. Tr. 486.

In a narrative letter dated July 28, 2017, Brown noted "Mr. Hamo Ibrahim has recently been opening up more about his condition. He had been talking about his nightmares throughout his life but has now stated that he has these while he is awake as well. He sees fighting, war and violence. In dreams he is told to do things to hurt others. He does get commands from hallucinations while he is awake from dead people but it is not dangerous. He feels distressed about this and would like it to stop." Tr. 509.

On August 17, 2017, Ibrahim began mental health treatment through nurse practitioner Cory Rabe, APRN. Tr. 511. Ibrahim reported restlessness, nightmares, sleep problems, hopelessness, bad temper, and depression. Tr. 511. He reported seeing things he had seen during the war. Tr. 511. His hobbies included building wooden instruments. Tr. 514. On mental status examination, he was dressed appropriately and fully alert. Tr. 514. His eye contact was poor and motor level hypoactive, but he had no observed mannerisms or gestures. Tr. 514. Ibrahim was cooperative and a good historian. Tr. 515. His speech was normal in quantity, amplitude, and speed. Tr. 515. His mood was depressed and affect flat. Tr. 515. His thought process was logical and stream of thought

concrete, but he reported auditory and visual hallucinations. Tr. 515. Although his memory was slightly impaired, his recent and remote memories were intact and his abstract thinking adequate. Tr. 515. Rabe estimated Ibrahim's intelligence as below average. His attention/concentration was adequate, his insight intact, his social judgment good, and his impulse control mildly impaired. Tr. 515. Rabe diagnosed major depressive disorder, recurrent, severe, with psychotic features; generalized anxiety disorder; and PTSD. Tr. 516. Rabe recommended Ibrahim increase his Lexapro dosage. Tr. 516.

On September 8, 2017, Ibrahim returned to Rabe and said he felt about the same. Tr. 518. He stated his sleep was better, and he did not have nightmares every night. Tr. 518. He experienced no hallucinations. Tr. 518. Rabe refilled Ibrahim's Lexapro prescription and added Hydroxyzine as needed. Tr. 519.

### III. Hearing Evidence

During the vocational portion of the hearing, the ALJ asked the vocational expert to assume that an individual, because of fatigue or mental symptoms, was off task and unable to focus at the job at hand. Based on these assumptions, the ALJ asked what percentage of the day the person could be off task before it would preclude all competitive employment. Tr. 127. The VE stated: "Once we reach 15 percent I do not feel they'd be able to hold competitive employment." Tr. 127.

The VE further indicated that if, in fact, Ibrahim needed additional supervision and time to carry out short simple instructions as indicated by the consultative exam, in her opinion he would not be employable. Tr. 128.

### STANDARD OF REVIEW

"When considering whether the ALJ properly denied social security benefits, [the Court] determine[s] whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (internal quotation marks omitted) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the Court's "review extends beyond examining the record to find substantial evidence in support of the ALJ's decision." *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) (internal quotation marks omitted) (quoting *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007)). The Court must "also consider evidence in the record that fairly detracts from that decision." *Id.* (internal quotation marks omitted) (quoting *Cox*, 495 F.3d at 617).

The Court also must determine whether the Commissioner's decision "is based on legal error." *Collins*, 648 F.3d at 871 (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (internal citations omitted) (citing *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003); *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983)). No deference is owed to the Commissioner's legal conclusions.

*Brueggemann*, 348 F.3d at 692 (stating that allegations of legal error are reviewed de novo).

## DISCUSSION

Ibrahim contends that the Commissioner's decision is not supported by substantial evidence. He also argues that the decision should be reversed because the Commissioner used incorrect legal standards when weighing the evidence.

### I. The ALJ's decision is supported by substantial evidence.

The Court many not reverse the ALJ's findings when there is sufficient evidence in the record to support them. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). "The Eighth Circuit recognizes the doctrine of harmless-error in Social Security cases." *Brown v. Colvin*, 992 F. Supp. 2d 947, 953 (D. Neb.), *aff'd*, 581 F. App'x 598 (8th Cir. 2014) (citing *Byes v. Astrue*, 678 F.3d 913, 917-18 (8th Cir. 2012)). To prove an error was not harmless, a plaintiff must provide "some indication that the ALJ would have decided differently if the error had not occurred." *Id.* (quoting *Byes*, 678 F.3d at 917).

An administrative finding will not be set aside based on an "arguable deficiency in opinion-writing technique" when it is unlikely it affected the outcome. *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) (quoting *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996). Ibrahim argues that substantial evidence does not support the ALJ's statement that 1) Ibrahim did not allege difficulty getting along with others, 2) he had mostly normal mental health status examinations, and 3) he was only moderately impaired.  Pl. Br., ECF No. 24, Page ID 638. For the following reasons, the Court finds the ALJ's findings are supported by substantial evidence in the record and any error in the statements made by the ALJ was harmless.

A. *Statement that Ibrahim did not allege difficulty getting along with others*

Before concluding that Ibrahim had "mild limitations in interacting with others," the ALJ stated "[Ibrahim] does not allege difficulty getting along with others and the evidence shows that he maintains meaningful relationships with other people." Tr. 20. Ibrahim alleges the statement "does not allege difficulty getting along with others" is in conflict with the evidence and with the ALJ's earlier acknowledgement that Ibrahim testified "he cannot be around other people," prefers to be alone, occasionally gets angry for no reason, and leaves the house for an hour or two when he does get angry to avoid offending others.[6] Tr. 15. The Commissioner argues that substantial evidence supports the ALJ's finding that Ibrahim had only mild limitations in interacting with others and the Court agrees.

The ALJ's statement can be interpreted as acknowledging that although Ibrahim does not care to interact with others and sometimes avoids interactions because of his anger, he does not have difficulty in the interactions themselves. The record reflects, and the ALJ acknowledged, on a typical day Ibrahim goes to the Center for People in Need for two hours, walks, and takes children to school occasionally. Tr. 20, 252. Ibrahim also attends some meetings with friends and other community leaders, and medical providers describe him as cooperative and pleasant. Tr. 20, 253, 322, 330, 515. It was also noted by the ALJ that Ibrahim did not appear to have difficulty interacting and answering

---

[6] Ibrahim's brief states that the evidence reflects that he "was irritable around family members even to the extent he would leave the house in order to avoid conflict." Pl. Br., ECF No. 24, Page ID 639. Ibrahim testified that he sometimes gets angry and leaves home for an hour or two to relax, and the reason he leaves home sometimes is because he has dreams and gets upset and angry. Tr. 124. The record also reflects that he reported irritability around his family. Tr. 321.

questions at the hearing. Tr. 20. Ibrahim's brother-in-law described Ibrahim's interaction with people in social activities as "[g]ood" but noted that in stressful situations he gets angry and wants to be alone. Tr. 247. Thus, the record contains substantial evidence of Ibrahim's ability to get along with others, supporting the ALJ's conclusion that Ibrahim has only mild limitations in interacting with others. The ALJ's error, if any, was harmless.

*B. Statement that Ibrahim had mostly normal mental status exams.*

Before concluding that Ibrahim had moderate limitations in the area of concentrating, persisting, or maintaining pace, the ALJ stated "[Ibrahim] had mostly normal mental status examinations." Tr. 20. Ibrahim argues the ALJ's assertion that he had "mostly normal mental status exams" is not supported by the evidence. Pl. Br., ECF No. 24, Page ID 639. The Commissioner argues that substantial evidence in the record supports the assertion, and the Court agrees.

On January 11, 2016, consultative examiner Dr. Eckert conducted a mental health exam ordered by Social Security. Tr. 320-23. She described Ibrahim as being in a depressed mood, not making eye contact, and exhibiting symptoms of anxiety and irritability. Tr. 321. She also noted that he had nightmares, flashbacks, and problems sleeping. Tr. 321. She described him as "oriented times three," and noted his moderate difficulty sustaining concentration and trouble comprehending or remembering things. Tr. 321. Ibrahim reported visual but not auditory hallucinations and Dr. Eckert concluded he did not appear to respond to internal stimuli. Tr. 322.

On May 5 and 26, June 9, 23, and 30, and July 28, 2017, Ibrahim met with Brown. Tr. 482-502. At each visit, Ibrahim reported being hopeless and anxious. Tr. 482-502. Brown's records reflect that Ibrahim's attention, concentration, activity, memory, insight,

judgment and eye contact were normal at each visit. Tr. 482-502. He was oriented in all spheres, his thought content was appropriate, and his organization logical. Tr. 482-502. At the May 5, 2017, appointment Brown noted that Ibrahim's mood worsened after his Lexapro dosage was decreased, and Ibrahim reported he always had a cyclic mood. Tr. 510. At his June 30, 2017, appointment Ibrahim reported that he had been hearing and seeing dead people and had been for most of his life. Tr. 486. Ibrahim reported the voices did not impact him negatively in any way. Tr. 486.

During Ibrahim's July 28, 2017, appointment with Brown, Ibrahim reported an increase in hallucinations and that they were giving commands. Tr. 482. He stated that "this has always happened but now he is more comfortable talking about it." Tr. 482. In a narrative letter dated July 28, 2017, Brown noted "Mr. Hamo Ibrahim has recently been opening up more about his condition. He had been talking about his nightmares throughout his life but has now stated that he has these while he is awake as well. He sees fighting, war and violence. In dreams he is told to do things to hurt others. He does get commands from hallucinations while he is awake from dead people but it is not dangerous. He feels distressed about this and would like it to stop." Tr. 509.

On August 17, 2017, Ibrahim met with Rabe. The mental status exam section of Rabe's report reflected that Ibrahim was fully alert, his thought process was logical, his stream of thought was concrete, his thought content was unremarkable, his immediate memory was slightly impaired but with intact recent and remote memory, his concentration was adequate, his judgment was good, his impulse control was mildly impaired, and his orientation was impaired. Tr. 514-15. The exam also reflected Ibrahim had a depressed mood, poor eye contact, flat affect, and hallucinations but no suicidal or

homicidal ideation. Tr. 515. Ibrahim reported restlessness, nightmares, sleep problems, depression and a bad temper. Tr. 511. Rabe diagnosed major depressive disorder, recurrent, severe, with psychotic features; generalized anxiety disorder; and PTSD. Tr. 516. Rabe recommended increasing Ibrahim's Lexapro dosage. Tr. 516.

On September 8, 2017, Ibrahim met with Rabe. Tr. 518-19. Ibrahim reported feeling about the same. Tr. 518. The mental status exam section of Rabe's records reflected that Ibrahim's thought process was logical, his thought content was unremarkable, his cognition was grossly intact, his memory was intact, his concentration was adequate, his judgment was intact, and his sleep had improved. Tr. 518-19. The exam also reflected Ibrahim had a depressed mood and poor eye contact, but no hallucination, suicidal ideation, or homicidal ideation. Tr. 518.

After reviewing the record as a whole, the Court concludes that the ALJ's assertion that Ibrahim had "mostly normal mental status exams" is supported by substantial evidence in the record.

   *C. Statement that Ibrahim is only moderately impaired.*

Ibrahim argues the ALJ's conclusion that he is only moderately impaired[7] is contradicted by substantial evidence that he had intrusive thoughts of dead people and suffered from hallucinations, and that these intrusive thoughts would distract him throughout the day in a work setting. The Commissioner argues that substantial evidence

---

[7] It is unclear what conclusion of the ALJ is being challenged by Ibrahim because nowhere in the ALJ's decision is the language "moderately impaired" used. However, from the context it appears that Ibrahim is challenging the ALJ's conclusion that Ibrahim has only moderate limitations in the area of functioning with respect to concentrating, persisting, or maintaining pace. Tr. 20. The Court will analyze the alleged error accordingly.

supports the ALJ's conclusion that Ibrahim has only moderate limitations with respect to concentrating, persisting, or maintaining pace, and the Court agrees.

Although there is evidence in the record that Ibrahim suffers from command hallucinations, Ibrahim has cited to no evidence regarding how often they occur, or what percentage of the day they would distract him in a work setting. As noted above, the evidence in the record supports the conclusion that Ibrahim had mostly normal mental health status exams with respect to concentrating, persisting, and maintaining pace. Dr. Eckert stated that Ibrahim does not appear to respond to internal stimuli. Tr. 322. Brown's notes regarding Ibrahim's June 30, 2017, appointment state that Ibrahim reported he had been hearing and seeing dead people for most of his life, and the voices did not impact him negatively in any way. Tr. 486. On August 17, 2017, Rabe noted that Ibrahim's attention/concentration was adequate, his social judgment good, and his impulse control only mildly impaired. Tr. 515. On August 17, 2017, Rabe adjusted Ibrahim's medications and at his appointment on September 8, 2017, no hallucinations were noted. Tr. 518. For these reasons, the Court concludes the ALJ's decision that Ibrahim had only moderate limitations in functioning regarding concentrating, persisting, or maintaining pace, is supported by substantial evidence.

## II. Incorrect legal standards were not used when weighing the evidence.

Ibrahim argues that incorrect legal standards were used when weighing the evidence. Specifically, he argues that 1) the therapist's check list of Ibrahim's mental status should have been disregarded; 2) the conclusions of the consultative exam should have been afforded great weight; and 3) the Commissioner should have considered the fact that Ibrahim cannot speak, read, or write English and only attended school through

fifth grade. Pl. Br., ECF No. 24, Page ID 639-49. For the following reasons, the Court finds the ALJ did not use incorrect legal standards when weighing the evidence.

### A. The therapist's check list indication of Ibrahim's mental status

Ibrahim argues the ALJ should have disregarded the objective checklist portion of the records from Ibrahim's therapist Brown because it contradicts the narrative in the remarks section of the records. Ibrahim speculates that Brown's reports were created using software which repeated the mental status examination portion of the record. Pl. Br. ECF No. 24, Page ID 640. Ibrahim's speculation is based on his observation that the objective checklist notes from each visit remained unchanged although the subjective remarks reflected varying symptoms reported by Ibrahim. Specifically, Ibrahim points to letters written by Brown on May 5 and July 28, 2017, stating that he experienced nightmares and intrusive thoughts, and sometimes felt so depressed that he could not get out of bed. *Id.* (citing Tr. 509-10). He argues that these discrepancies constitute internal inconsistency and, thus, the repetitive notes regarding Ibrahim's objective mental status should have been given little weight. The Commissioner argues that Brown was not a treating physician[8] and any inconsistencies in the record were adequately resolved by the ALJ.

Evidence is considered "inconsistent when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be

---

[8] Ibrahim cites only to the standard of weighing an opinion of a treating physician which provides that is can be given little weight where internally inconsistent or conclusory. Pl. Br., ECF No. 24, Page ID 641. Whether or not Brown was a treating physician is not relevant for purposes of this argument because inconsistent medical opinion evidence is subject to the same standard as other inconsistent evidence. *See* 20 C.F.R. § 416.920b(b)(1).

based on medically acceptable clinical or laboratory diagnostic techniques." 20 C.F.R. § 416.920b(b). If any evidence in the case record, "including any medical opinion(s) . . . is inconsistent, [the Commission] will consider the relevant evidence and see whether [the Commission] can determine whether [the claimant is] disabled based on the evidence [the Commission has]." 20 C.F.R. § 416.920b(b)(1).

The ALJ did not ignore the evidence in the "remarks made during session" section of Brown's records, nor the information about Ibrahim's complaints to Brown which were included in Brown's narrative letters. Instead, the ALJ stated that "[t]urning to the claimant's mental impairments, the objective evidence is not consistent with the claimant's alleged severe symptoms" and stated that Ibrahim "consistently had good mental status examinations with regular mental health treatment." Tr. 17. The ALJ then discussed the evidence in Brown's records, noting both the objective good mental status, as well as the subjective complaints Ibrahim reported to Brown such as his cyclical mood and feelings of anxiety, hopelessness, and exhaustion. Tr. 17-18. The ALJ considered the fact that Ibrahim reported hearing and seeing dead people, which he did not believe impacted him negatively. Tr. 18, 486. The ALJ also considered that Ibrahim reported he had nightmares, and command hallucinations while awake. Tr. 18.

Brown's recitation in the subjective "remarks made during session" and his conveyance of these same reported symptoms in the narrative letters are separate from the objective section of his report showing Ibrahim's good mental status examinations. The two sections represent two separate components of the same record—one based on the symptoms reported by Ibrahim to Brown and one based on Brown's observations during the appointment. The ALJ considered not only Brown's assessment of Ibrahim's

mental health status, but also the initial and follow-up assessments by Rabe. Tr. 18. Thus, there is no internal inconsistency with Brown's opinions and the ALJ appropriately weighed the conflicting evidence of Ibrahim's subjective reports of his symptoms and the objective evidence in the record.

### B. Weight given to the conclusions of the consultative exam

Ibrahim argues the ALJ failed to give appropriate weight to Dr. Eckert's conclusions that Ibrahim might forget where items are, such as his glasses when held in his hand; might need requests repeated; had trouble with comprehension and memory; and might "need additional supervision and time to carry out short and simple instructions under ordinary supervision," when determining Ibrahim's residual functional capacity. Tr. 320-23. The Commissioner argues the ALJ provided good reason for weight he assigned Dr. Eckert's opinions, and the Court agrees.

"The ALJ is responsible for determining a claimant's RFC, a determination that must be made based on medical evidence that addresses the claimant's ability to function in the workplace. *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004) (citation omitted). "When assessing a Claimant's RFC, the ALJ must consider all relevant evidence in the record." *Julian v. Colvin*, 826 F.3d 1082, 1089 (8th Cir. 2016) (citation omitted). The ALJ is required to evaluate each medical opinion received, regardless of its source. 20 C.F.R. § 416.927(c). In determining the weight to be given to a medical opinion from a non-treating source, the ALJ considers the 1) examining relationship, 2) treatment relationship, 3) supportability, 4) consistency with the record as a whole, 5) specialization, and 6) other factors which tend to support or contradict the medical opinion. *Id.* "Depending on the particular facts in a case, and after applying the factors for weighing

opinion evidence, an opinion from a medical source who is not an acceptable medical source or from a nonmedical source may outweigh the medical opinion of an acceptable medical source . . .." 20 C.F.R. § 416.927(f)(1).

After Dr. Eckert's consultative exam in January 2016, she noted that Ibrahim might forget where items are; might need requests repeated; and had trouble with comprehension and memory. Tr. 320-23. Dr. Eckert concluded that Ibrahim "appeared to be able to understand, remember and carry out short and simple instructions." Tr. 323. Yet she stated that he "may need additional supervision and time to carry out short and simple instructions under ordinary supervision" and that his participation in the interview "was indicative of this." *Id.* At the hearing, the VE opined that if Ibrahim needed additional supervision and time to carry out short and simple instructions under ordinary supervision, this would preclude employment.[9] Tr. 128. The VE also testified, in response to a hypothetical posed by the ALJ, that if Ibrahim was off task for more than 14 percent of the work day this would also preclude competitive employment. Tr. 127.

The ALJ stated that he "considered opinion evidence in accordance with the requirements of 20 CFR 416.927." Tr. 15. After discussing Dr. Eckert's opinions in detail, the ALJ noted that the "opinions are consistent with the record and given some weight because [Ibrahim] had regular mental health treatment, but his symptoms improved with

_____

[9] The VE testified, in response to a hypothetical posed by the ALJ, that if Ibrahim were unable to stay on task for more than 14 percent of the work day this would also preclude competitive employment. Tr. 127. Ibrahim argues that his physical problems as well as command hallucinations and intrusive thoughts interfere with his daily functioning and it is apparent from the record that he would be off task far more than 15 percent of the time. Pl. Br., ECF No. 24, Page ID 645. Ibrahim cites to no evidence showing the percentage of the day he would be off task. Also, on August 8, 2017, Rabe changed Ibrahim's medications, and on September 8, 2017, reported that Ibrahim was no longer suffering hallucinations. Tr. 518. Ibrahim has cited no evidence in the record of any ongoing physical problems that would cause him to be off task.

medication and he consistently had normal mental status exams." TR. 19. The ALJ stated that Dr. Eckert's opinions that Ibrahim "may need additional supervision and time to carryout short and simple instructions are given less weight because the claimant had mostly normal mental status examinations and remained capable of performing activities of daily living; he performed personal care chores and occasionally did woodworking." Tr. 19. Ultimately, the ALJ concluded that Ibrahim had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to occasional exposure to extreme cold, extreme heat, humidity, hazardous machinery, and unprotected heights. Additionally, the claimant can understand, remember, and carryout simple, routine instructions." Tr. 14.

Substantial evidence in the record supports the ALJ's assessment that Ibrahim remained capable of performing activities of daily living, performing self-care chores, and occasionally doing woodworking. Tr. 247, 248, 252, 253, 323, 518. There is substantial evidence that Ibrahim's mental health improved with medication after Dr. Eckert's January 2016, assessment. Tr. 411, 423, 430, 434, 516, 518. There is substantial evidence in the record of Ibrahim's generally normal objective mental status examinations. There was substantial evidence that Ibrahim's circumstances changed over time with treatment of his mental health conditions, and that Dr. Eckert's assessment was inconsistent with the activities Ibrahim was performing in his daily life. Thus, the ALJ did not err in giving less weight to Dr. Eckert's assessment of Ibrahim's ability to carry out short and simple instructions under ordinary supervision.

C. *Inability to speak, write, or read English and only five years of formal education.*

Ibrahim argues that he cannot speak English and only attended primary school through the fifth grade in his country of origin, thus, rendering him the functional equivalent of being illiterate, and that there his lack of education or illiteracy were not considered by the ALJ. The Commissioner argues that the record reflects that Ibrahim's education, illiteracy, and inability to communicate in English were considered by the ALJ, and the Court agrees.

In 20 C.F.R. § 416.964, it is specified that "[t]he term education also includes how well you are able to communicate in English since this ability is often acquired or improved by education." The hypothetical person the ALJ described to the VE was someone of the same age as Ibrahim with the same education and work history. Tr. 126. Thus, this should have included Ibrahim's ability or inability to speak and understand English, as well as his ability or inability to read or write in English. *See Murphy v. Colvin*, 759 F.3d 811, 820 (7th Cir. 2014) ("if the hypothetical posed to the VE does not include all of the claimant's limitations, there must be some amount of evidence in the record indicating that the VE knew the extent of the claimant's limitations").

At the hearing and before the testimony of the VE, the ALJ asked about Ibrahim's education level, to which Ibrahim responded that he had five years of formal education. Tr. 119. The ALJ then asked Ibrahim whether he had learned to read or write any English. *Id.* Ibrahim responded that he had learned a little bit but not much. *Id.* Further questioning by the ALJ determined that Ibrahim did not know enough English to make a grocery list or read a street sign. *Id.* Ibrahim communicated at the hearing through an interpreter. Tr. 119. The VE later testified that the hypothetical person with Ibrahim's education could perform work as a night cleaner, housekeeping assistant, or small product assembler. Tr.

127. Thus, at the time of the vocational expert's testimony, the VE was aware that Ibrahim could not read, write, or communicate in English, except a minimal amount. Finally, the ALJ's decision explicitly found that Ibrahim was "not able to communicate in English, and is considered in the same way as an individual who is illiterate in English." Tr. 21. Thus, Ibrahim has not demonstrated that the ALJ's decision, or the hypothetical the ALJ posed to the VE, failed to consider that Ibrahim was functionally illiterate and could not communicate in English.

## CONCLUSION

For the reasons stated above, the Motion for an Order Reversing Commissioner's Decision, ECF No. 22, will be denied, and the Motion to Affirm Commissioner's Decision, ECF No. 27, will be granted. Accordingly,

IT IS ORDERED:

1. The Motion for an Order Reversing Commissioner's Decision, ECF No. 22, filed by Plaintiff Hamo Murad Ibrahim, is denied;

2. The Motion to Affirm Commissioner's Decision, ECF No. 27, filed by Defendant Nancy C. Berryhill, is granted;

3. The Commissioner's decision is affirmed;

4. The appeal is denied; and

5. A separate judgment will be entered.

Dated this 21st day of May 2019.

BY THE COURT:

s/Laurie Smith Camp
Senior United States District Judge